UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 20 CR 299 |
| | ) | |
| vs. | ) | Judge Andrea Wood |
| | ) | |
| HARDY BROWNER | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Hardy Lee Browner attempted to sexually traffic a minor female with whom the defendant had been having sex. Separately, the defendant lied to the FBI when the FBI interviewed the defendant regarding communications they[1] had with members of ISIS, a designated Foreign Terrorist Organization. For both offenses, the government recommends a sentence of 292 months, at the low end of the advisory sentencing guidelines range of 292 to 365 months' imprisonment.

**I.    Procedural History**

The defendant was originally charged in two separate indictments in the Northern District of Illinois. In Case No. 20 CR 299, the defendant was charged with knowingly and willfully making a materially false statement involving international terrorism in a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI"), in violation of Title 18, United States Code, Section 1001(a)(2).

In Case No. 21 CR 302, before Judge Virginia Kendall, the defendant was charged with sex trafficking of a minor in violation of Title 18, United States Code,

---

[1] It is the government's understanding that defendant uses the pronouns "they" and "their."

1

Section 1591(a), (b)(1), (b)(2), and (c); knowingly obstructing or interfering with the enforcement of the sex trafficking statute, in violation of Title 18, United States Code, Section 1591(d); and using a facility and means of interstate commerce to persuade or induce a minor under the age of 18 to engage in unlawful sexual activity, in violation of Title 18, United States Code, Section 2422(b).

On January 11, 2023, the defendant pleaded guilty to a two-count superseding information in Case No. 20 CR 299, which covered the offense conduct in both cases. In his plea agreement, the defendant admitted to (i) knowingly and willfully making a materially false statement involving international terrorism to the FBI, in violation of Title 18, United States Code, Section 1001(a)(2) (Count 1); and (ii) sex trafficking of a minor, in violation of Title 18, United States Code, Sections 18 U.S.C. 1591(a)(1), (b)(2) and (c) (Count 2).

The defendant's sentencing is scheduled for October 11, 2024. The government will move to dismiss Case No. 21 CR 302 before Judge Kendall after sentencing in this case.

## II. Offense Conduct and Relevant Conduct

The background facts are taken from the defendant's plea agreement, as well as the exhibits submitted with the government's version.

### a. False Statements

From between on or about May 17 and July 13, 2014, the defendant used their Twitter account (@AhkTheBlackArab) to communicate via public tweets with Twitter

2

account @AbuFarriss. The @AbuFarriss account was used by an Islamic State recruiter referred to as Individual A in the indictment.[2]

For example, on or about June 28, 2014, defendant wrote to @AbuFarriss: "someone said martyrdom attacks are forced on dawlah members saying you can't say no to it is that true?" ("Dawlah" is another phrase for the Islamic State.) @AbuFarriss responded, "not true at all. You sign up if uu wnt to . . . Dawlah has soo many brothers for martyrdom ops they draw lots instead of a que or list." That same day, defendant responded, "enter the truth has given a lot of people a different point of view."

On or about July 13, 2014, defendant tweeted to @AbuFarriss: "are Americans obliged to pledge bayyah to IS [the Islamic State or ISIS] and if so how do they do that when there [sic] so far from IS." ("Bayyah" is a reference to an oath of allegiance, and "IS" is a reference to the Islamic State.)

Defendant also communicated by Twitter with @Dawla_Newsmedia, which is a Twitter account for ISIS's media arm and which listed, "Join the Islamic State" on its public account. For example, on or about May 11, 2014, defendant wrote to @Dawla_Newsmedia: "isn't it hard for an american Muslim to make hijrah [immigrate] there?" On May 17, 2014, defendant tweeted to @Dawla_Newsmedia and

---

[2] According to @AbuFarriss's profile, the user of @AbuFarriss posted his location as "Islamic State – Khilafa" and displayed a profile photo and background image that depicted images of the ISIS flag.

3

to another account that appears to be held by an ISIS sympathizer, "death will find you regardless better to choose a path of righteousness rather than a path of comfort."

The defendant created and controlled other Twitter accounts, including @RightlyGuidedTA, @Ahkishaykh, and @ChocalateShaykh. Defendant used those three Twitter accounts to make public posts and ask questions regarding, among other subjects, "jihad," martyrdom, and ISIS. For example, on March 31, 2013, defendant tweeted using the "@RightlyguidedTA" account: "I didn't kno self deffense [sic] was Terrorism! #Jihad." On April 1, 2013, defendant tweeted: "Muslims are not violent people we just firmly believe in self defense! #jihad #mujahideen #khilafah." *Id.* On April 2, 2013, defendant tweeted: "One mans Terrorist is the next mans Patriots #Mujahideen #Crusaders #ShariaLaw."

The defendant's Twitter account with moniker @ChocalateShaykh listed its location as "Ansar Al Islam," which at the time was designated as a Foreign Terrorist Organization by the State Department. On October 26, 2014, @ChocalateShaykh tweeted a photograph of an ISIS fighter holding a gun, based on the flag in the photograph. On November 5, 2014, the defendant tweeted: "difference between 1 who loves life and the 1 who seeks death is the one who loves life won't have the heart in battle to do the necessary."

On July 15, 2015, FBI agents interviewed the defendant regarding their Twitter accounts, their communications with an ISIS recruiter, and their pro-ISIS Twitter postings. The defendant told FBI agents that (a) defendant did not use the following Twitter accounts: @AhkTheBlackArab, @RightlyGuidedTA, @Ahkishaykh,

4

and @ChocalateShaykh; and (b) defendant did not communicate with the user of the @AbuFarriss Twitter account and @Dawla_NewsMedia. Those were knowing lies about material matters relating to international terrorism.

### b. Trafficking Conduct

In around January 2020, the FBI began investigating the defendant's conduct related to a girl referred to as Minor A, after Minor A's foster mother reported discovering Instagram messages regarding Minor A having sex with older men for money.

Minor A was born in December 2005. During the summer of 2019, the defendant began communicating with Minor A, who was 13 at the time. The defendant and Minor A met in person on multiple occasions, and began having sexual intercourse sometime that summer.

During some of those meetings, including in December 2019, after Minor A turned 14 years old and while the defendant was 32 years old, the defendant and Minor A continued to have vaginal and oral sex. When they saw each other, the defendant sometimes gave Minor A cash or other items of value. The defendant also asked Minor A to send the defendant videos and pictures of her naked, which she did on about two occasions.

Between approximately December 16, 2019, and December 20, 2019, the defendant used Instagram to solicit Minor A to engage in commercial sex acts. In their Instagram communications, the defendant and Minor A discussed past and future payments from the defendant to Minor A. In those communications, the

5

defendant also discussed setting up commercial sex acts between Minor A and other individuals, although no such acts with other individuals ultimately took place. Specifically, the defendant told Minor A that "if you wanna make money I can really show you but u gotta be Fa real." Minor A asked how much and the defendant replied "depends on what u wanna do…I'm saying I can put u on wit saling [selling] pussy." The defendant stated that they could be Minor A's "pimp" and that they could make money. The remainder of the conversations are included in the government's version.

Luckily, the defendant never succeeded in their efforts to traffick Minor A, although not for lack of trying. Minor A's foster mother discovered the Instagram messages with the defendant, and immediately took action to contact law enforcement.

### III. Statutory Penalties

Count One carries a maximum sentence of 8 years' imprisonment, because the investigation that gave rise to the FBI's interview of the defendant involved a matter of international terrorism. Count One also carries a maximum fine of $250,000. The Court also may impose a term of supervised release of not more than three years.

Count Two carries a maximum sentence of life imprisonment, and a statutory mandatory minimum sentence of 10 years' imprisonment under Title 18, United States Code, Section 1591(b)(2). Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation on this count. Count Two also carries a maximum fine of $250,000. With respect to Count Two, the Court

6

must impose a term of supervised release of at least five years, and up to any number of years, including life.

Pursuant to Title 18, United States Code, Section 3014, the defendant will be assessed an additional $5,000 if the Court determines that the defendant is a non-indigent person.

## IV. Sentencing Guidelines Calculations

### a. Offense Level for Count One

The base offense level for Count One is 14, pursuant to Guideline § 2J1.2(a).

Pursuant to Guideline § 2J1.2(b)(1)(C), the offense level is increased by 12 levels because the statutory maximum term of eight years' imprisonment applies since the matter relates to international terrorism.

The adjusted offense level for Count One is therefore 26.

### b. Offense Level for Count Two

The base offense level for Count Two is 30 pursuant to Guideline § 2G1.3(a)(2), because Minor A had attained the age of 14 years but had not yet attained the age of 18 years at the time of the offense.

Pursuant to Guideline § 2G1.3(b)(2)(B) and Application Note 3(B), the offense level is increased by 2 levels because the defendant unduly influenced Minor A to engage in prohibited sexual conduct. "Prohibited sexual conduct" includes "any sexual activity for which a person can be charged with a criminal offense." Guideline § 2A3.1 app. note 1. Where, as here, the defendant is at least ten years older than Minor A, there is a rebuttable presumption that defendant "unduly influenced" a minor. The

fact that defendant was about 18 years older than Minor A is strong indication of how much influence they had over Minor A. *United States v. Watkins*, 667 F.3d 254, 265 (2d Cir. 2012) (noting that "given the substantial age difference between [defendant] and [his victim], the District Court did not err in finding that the rebuttable presumption was not overcome by alleged evidence of [the victim's] 'eagerness' to participate in [defendant's] offense").

Pursuant to Guideline § 2G1.3(b)(3)(A), the offense level is increased by 2 levels because the defendant used an interactive computer service (Instagram) to patronize and solicit Minor A to engage in prohibited sexual conduct.

Pursuant to Guideline § 2G1.3(b)(4)(A), the offense level is increased by 2 levels because the offense involved the commission of a sex act or sexual conduct. "Sex act" and "sexual contact" are defined in 18 U.S.C § 2246(2) and (3) to include sexual intercourse and also the intentional touching of certain body parts. This enhancement is easily satisfied by the sexual encounters between the defendant and the victim.

The adjusted offense level for Count Two is therefore 36.

### c. Grouping

Pursuant to Guideline §§ 3D1.3 and 3D1.4, the offenses are not grouped, but there is no increase to the total offense level because the offense level for Count One is 9 or more levels lower than the offense level for Count Two. The total adjusted offense level is therefore 36, before the adjustments described below are applied.

### d. Acceptance of Responsibility

If the government does not receive evidence in conflict with this provision, and

8

if the defendant continues to accept responsibility, a 2-level reduction in the offense level is appropriate under Guideline § 3E1.1(a).

An additional 1-level reduction is appropriate under Guideline § 3E1.1(b), provided the Court determines the offense level to be 16 or greater prior to determining that the defendant is entitled to a 2-level reduction for acceptance of responsibility, because the defendant timely notified the government of their intention to plead guilty.

### e. Repeat and Dangerous Sex Offender Against Minors

Pursuant to Guideline § 4B1.5(b)(1), the offense level is increased by 5 levels because the sex trafficking offense in Count Two is a covered sex crime, neither § 4B1.1 nor subsection (a) of the Guidelines applies, and the defendant engaged in a pattern of activity involving prohibited sexual conduct.

### f. Criminal History Category

Based on the facts now known to the government, the defendant's criminal history points equal 6 and their criminal history category is III.[3]

The defendant was sentenced on or about June 23, 2006, to 40 months' imprisonment as a result of the defendant's conviction for possessing a firearm as a convicted person in the Superior Court of Los Angeles County, California. Pursuant to Guideline § 4A1.1(a), the defendant receives three criminal history points for this sentence.

---

[3] As addressed in the Pre-Sentence Report, the defendant had been convicted of multiple offenses when they were a juvenile. None of those offenses result in criminal history points.

The defendant was sentenced on or about April 28, 2010, to 16 months' imprisonment as a result of the defendant's conviction for robbery and violation of parole in the Superior Court of Los Angeles County, California. Pursuant to Guideline § 4A1.1(a), the defendant receives three criminal history points for this sentence.

### g. Anticipated Advisory Sentencing Guidelines Range

Based on the facts now known to the government, the anticipated adjusted total offense level is 38 which, when combined with the anticipated criminal history category of III, results in an anticipated advisory sentencing guidelines range of 292 to 365 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

## V. THE 3553(A) FACTORS

Following a calculation of the applicable Guidelines range, the Court must consider the application of the factors set forth in 18 U.S.C. § 3553(a). *See United States v. Damato*, 672 F.3d 832, 838 (10th Cir. 2012) (discussing review of sentences for "procedural reasonableness" and "substantive reasonableness"). The Court should consider each of the § 3553(a) factors, explain the chosen sentence, and explain any deviation from the Guidelines range. *United States v. Shuck*, 713 F.3d 563, 570 (10th Cir. 2013). Those factors include:

(1) the nature and circumstances of the offense and the history and characteristics of each defendant;

(2) the need for the sentence imposed

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) the need to afford adequate deterrence to criminal conduct;

>(C) to protect the public from further crimes of the defendant; and
>
>(D) to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a).

Additionally, the Court must consider the kinds of sentences available, the range set forth by the Guidelines, any pertinent policy statements by the Sentencing Commission and the need to avoid unwarranted sentencing disparities. *Id.*

**A.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Promote Deterrence, and Protect the Public from Further Crimes of the Defendant**

Sex trafficking of minors is an extremely serious offense because of its "devastating and long-term effects" on the victim and "greater society." *United States v. Whitley*, 354 F. Supp. 3d 930, 934 (N.D. Ill. 2019) (collecting cases). Unfortunately, minor victims are prevalent in the sex trafficking industry.

The defendant's actions, which caused a 13- (and later 14-) year old girl to engage in sex acts with them and enticed her to engage in sex acts with strangers for money, have created a trauma for Minor A that is nearly impossible to imagine, quantify, or truly understand. It was only Minor A's foster mother's discovery of defendant's Instagram messages, followed by the defendant's arrest on the false statement charge, that stopped the defendant from fulfilling their goal. Although Minor A has not provided a victim impact statement, she did say that she was glad the defendant was arrested and her toxic relationship was able to end. She described

11

her experience with the defendant as "weird," "cruel," and "sad," and feels the defendant manipulated her. *See* GVO Exh. G.

However, the arrest of the defendant does not end Minor A's troubles. In order to estimate the projected psychiatric and psychological care that Minor A will need in the future, the government consulted with Dr. Diana S. Goldstein, Ph.D., ABPP, who is the owner and Director of Neuropsychology of Isaac Ray Forensic Group, LLC. According to Dr. Goldstein, "Minor A struggled with mood and behavioral issues prior to becoming a trafficking victim, which, along with placement in multiple foster home environments (and feeling "lost in the system" since a young age, with unreliable parental involvement over many years, according to Minor A), most certainly increased her vulnerability to victimization." The defendant took advantage of Minor A's vulnerability.

Minor A has been diagnosed with Post Traumatic Stress Disorder, a diagnosis she received in the summer of 2019, around the time she started have sex with the defendant. GVO Exh. I. According to Dr. Goldstein, Minor A has a complex case of PTSD, which "shares symptoms with PTSD but includes additional symptoms, including emotional difficulties (problems controlling emotions, feeling rage, depression, panic, or shame, and difficulty identifying and expressing emotions); behavioral difficulties (impulsivity, aggressiveness, sexual acting out, alcohol or drug abuse, self-destructive behavior, and sleep disturbance); cognitive difficulties (dissociation, amnesia, depersonalization, and impaired memory for state-based events); *interpersonal difficulties* (difficulty maintaining relationships, avoiding

friendships, or feeling connected with others); and *somatization* (increased medical problems or many visits to medical practitioners)." GVO Exh. H.

Dr. Goldstein's brief interaction with Minor A demonstrates that these symptoms are not theoretical but are actualized with Minor A. Dr. Goldstein found Minor A's "experience [with the defendant] was distressing and her emotional intensity throughout the conversation reflected anger and physiologic reactivity to the entire topic." Minor A expressed anger toward the defendant and found discussing the situation to be extremely stressful. Minor A is now 18, and is realizing what the defendant did to her – something her 14 year old self could not understand. Minor A has had a difficult life and, although the defendant is not the cause of all her difficulties, they took advantage of her situation and exacerbated Minor A's issues. A guideline sentence will adequately reflect the trauma they caused her that she will have to deal with the rest of her life.

*Deterrence and Protect the Public*

Because the defendant is receiving mental health treatment which addresses what appears to be an underlying issue that may have caused some of the defendant's conduct, the government does not anticipate the defendant being a recidivist. The need for specific deterrence or to protect the public, therefore, is not a compelling factor, however, a guideline sentence is still needed to act as a deterrence to other sex traffickers from targeting other minors. Because minors (and vulnerable minors in particular) are attracted to quick money without appreciating the consequences, a strong sentence is necessary to deter criminals like them.

13

The culture of impunity surrounding sex trafficking must end. If there is hope of deterring sex trafficking, the sentences in sex trafficking cases must be significant. Congress has recognized this by creating stiff mandatory minimum penalties and significant Guideline ranges. Traffickers operating today should receive the message that if you traffic children in the Chicagoland area, the sentence will be severe.

*Promote Respect for the Law*

The sentence should also promote respect for the law. Count One—false statements to the FBI in a matter of international terrorism—is not the driving factor in the sentencing guidelines nor in the 3553 factors but that offense should not be ignored by the Court in determining a just sentence. That offense figures prominently in promoting respect for the law and is a very serious offense.

The FBI questioned the defendant about their communications with known ISIS social media accounts. The FBI was looking to the defendant to assist the government in gathering information on ISIS for intelligence purposes, including: Who in ISIS did the defendant speak to? What information did they provide the defendant regarding routes to Syria or Iraq to join ISIS? What other Americans might have taken these routes? And who would assist travelers along the routes? This information could have proven usual to the FBI in stopping other Americans from providing support to ISIS. Instead of assisting the agents, the defendant demonstrated a complete lack of respect for the law by lying to them. They denied ever communicating with anyone from ISIS, and they denied the social media accounts were theirs. The defendant disrespected law enforcement agents and sought

14

to thwart the FBI's mission in defending against terrorist organizations. A guideline sentence is necessary to promote respect for the law and ensure the defendant complies with law enforcement in the future.

The defendant's public posts are also deeply troubling and violent. In those posts, the defendant glorified violent extremism, by describing "jihad" as a form of "self defense" and proclaiming "One mans Terrorist is the next mans Patriots #Mujahideen #Crusaders #ShariaLaw." Although defendant was not criminally charged due to the substance of their postings, these deeply troubling messages—which defendant spread publicly in an effort to publicize their support for ISIS—cannot be ignored.

*History and Characteristics of the Defendant*

The government recognizes that the defendant, like Minor A, has had family issues in their youth and that the defendant has had mental health issues, as addressed in the defendant's expert witness report. On the other hand, the defendant, with their awareness and sensitivity to a poor home life, should have recognized the same with Minor A and the damage they could cause her through their actions.

## VI. SUPERVISED RELEASE

The government concurs with the conditions of Supervised Release recommended by the Probation Officer.

## VII. RESTITUTION

Pursuant to 18 U.S.C. § 3663, the Court shall order the defendant to make restitution to the victim of the offense. Specifically, the following provisions of 18 U.S.C. § 3663(b)(2) require the defendant to:

15

(A) pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

(B) pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

(C) reimburse the victim for income lost by such victim as a result of such offense . . .

As these provisions make clear, "a restitution order can include payments to victims of the offense for the projected cost of future mental health treatment." *United States v. Dickey*, 52 F.4th 680, 687 (7th Cir. 2022); *see also See United States v. Protho*, 41 F.4th 812, 832 (7th Cir. 2022) ("A district court's restitution order may require the defendant to pay any victim harmed by the defendant's offense the cost of necessary medical and related professional services for psychiatric and psychological care."); *United States v. Danser*, 270 F.3d 451, 455 (7th Cir. 2001) ("In light of Congress's intent to make whole those victims of sexual exploitation, we find that section 2259 allows for restitutionary damages for the future costs of therapy.").

*Restitution Request*

The government is seeking restitution in the amount of $85,250 for Minor A's future psychiatry and psychotherapy costs related to the defendant's sexual assault and attempted trafficking.[4]

---

[4] Minor A's previous medical expenses were paid for by the State of Illinois and are thus not included in this restitution request. In the event the State submits a detailed restitution request, the government will revise its restitution submission.

16

In order to estimate the cost of projected psychiatric and psychological care that Minor A will need in the future, the government consulted with Dr. Goldstein, a licensed clinical neuropsychologist, whose report is attached to the July 25, 2024, Supplement to the Government's Version of the Offense as Exhibit H. The Seventh Circuit has affirmed restitution awards based on Dr. Goldstein's estimates of projected therapy costs for victims suffering from trauma disorders. *See, e.g., Protho*, 41 F.4th at 832 (affirming restitution award of $87,770 to a kidnapping victim, based on future therapy cost, finding the district court properly concluded that Dr. Goldstein was "very well qualified in her field" and gave her testimony a "significant amount of weight"); *Dickey*, 52 F.4th at 687-88.

Dr. Goldstein provided approximate anticipated costs of future psychiatry and psychotherapy that Minor A will likely need as a result of this offense. This was based on Dr. Goldstein's experience and training, her interview with Minor A and her review of Minor A's medical records, grand jury testimony, and other materials in this case.

Minor A's medical records show that in the summer of 2019, around the time Minor A first met and began having a sex with the defendant, she sought medical treatment for various physical and psychological issues. She was admitted to a psychiatric hospital in June 2019, and she continued to receive psychiatric therapy in July and August 2019 due to a "reaction to severe stress, unspecified." She was also treated for a urinary tract infection on August 16, 2019. Minor A's psychological and physical condition also suffered in the year following her relationship with

17

Browner, including a stillbirth at 25 weeks' gestation in October 2020, although Browner is not believed to be the biological parent.

Dr. Goldstein opined that Minor A can be considered a sex trafficking victim, because "defendant Browner paid Minor A for sexual encounters and made known his (now her) intentions to prostitute Minor A to male friends and other male strangers." Based on her conversation with Minor A, the evidence in this case, and the empirical literature about sex trafficking victims, Dr. Goldstein opined that "research robustly supports the conclusion that the mental health consequences of being a sex trafficking victim can include numerous disorders impacting mental health and behavior, including post-traumatic stress disorder (PTSD), dissociative symptoms, mood and anxiety disorders, substance misuse or disorders . . . and attention deficit/hyperactivity (ADHD) and adjustment disorders among youth." *Id.* Dr. Goldstein added that sex trafficking victims' "psychosocial outcomes depend on access to appropriate services that address their emotional, behavioral, interpersonal, cognitive and environmental needs." In addition, Dr. Goldstein noted the "wide range of negative short- and long-term consequences, including low self-esteem, depression, suicidal ideation and suicide attempts, eating disorder, substance use and antisocial personality," that are associated with girls who have sexual intercourse before the age of 15.

Dr. Goldstein opined that "[t]reating CPTSD can be a life-long endeavor, especially for those whose traumatic experiences occur early in life." Dr. Goldstein therefore anticipates that Minor A will need both psychiatry and psychotherapy

18

treatment potentially for the rest of her life based on her post-traumatic stress disorder.

Dr. Goldstein detailed therapy and psychiatry costs in 2024 as follows: (1) Individual therapy sessions typically cost between $90 and $130 for Master's level therapists and between $120 and $165 for doctoral level therapists for a 50-minutes session. (2) Psychiatry sessions typically cost between $75 and $150 for a 15-minute session.

If Minor A were to attend one therapy session per week (absent holidays) and one psychiatry session per month for 25 years at the average of the 2024 costs for those services, this would amount to a total of $170,500, based on (1) $137,500 for therapy ($110 x 50 x 25); and (2) $33,000 for psychiatry ($110 x 12 x 25). This is a conservative estimate, given that costs will rise over time and given that, at 18 years old, Minor A is expected to live more than 25 years. The government recognizes that the defendant's conduct is likely not the sole cause of Minor A's psychological challenges. Accordingly, the government requests that the defendant be ordered to pay half of Minor A's anticipated psychotherapy and psychiatry costs, which is $85,250.

If necessary, and if Dr. Goldstein's conclusions are challenged, the government can present her testimony at a hearing.

## VIII. CONCLUSION

The government recommends that this Court sentence the defendant to a guideline sentence of 292 months' imprisonment followed by five years' supervised release.

The sentence would be sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a).

                                      Respectfully submitted,

                                      MORRIS PASQUAL
                                      Acting United States Attorney

By:   *s/Barry Jonas*
       BARRY JONAS
       JULIA SCHWARTZ
       Assistant United States Attorneys

Dated: September 26, 2024